CHRISTIAN, J.
The principles affirmed in the case of Miller & als. v. Blose’s ex’or & als., in which a motion for a rehearing has to-day been overruled, must govern the case before us. It arose out of the same transactions, and the nature of the evidence is *256 almost precisely the same. In both cases an effort is made by the defendants to set up a resulting trust, by parol testimony, against a deed absolute on its face. In both cases the evidence is of so vague, uncertain and unsatisfactory a character as cannot, after so long a lapse of time, upon the principles which govern courts of equity, convert deeds absolute on their face into mere trusts, depriving the grantees, and those who claim under them, of all beneficial interest in the estates conveyed, and transferring it to others not named in the conveyances.
It is not necessary to repeat, in this case, a discussion and application of these principles and the authorities upon which they are founded. It is sufficient to refer to the ^opinion in the case of Miller & als. v. Blose’s ex’or, delivered at the September term, 1876, of this court, and reaffirmed to-day by overruling the motion for a rehearing.
A brief reference to the facts of this case before us will show that it must be determined upon the principles declared in the former case.
William Kite died intestate in the year 1839, possessed of a large real and personal estate. He left surviving him a widow (who died in 1843,) and seven children — four sons and three daughters. Among several tracts of land of which the said William Kite died seized, was one which was conveyed to William Kite and Jacob Miller, jointly, by Stevens and wife in 1831, and one conveyed by Jacob Conrad to William Kite and S. B. Jennings, jointly, in the year 1837. The consideration expressed on the face of the deeds was in the one case $7,000. and in the other $8,000.
These deeds were duly recorded shortly after their execution, and copies of the same are filed with the record. Sarah, daughter of William Kite, intermarried with Jacob Miller, and Ann, another of his daughters (and the mother of the appellants in this case), intermarried with S. B. Jennings.
It is admitted by the heirs of Mrs. Jennings in their answer that after the death of William Kite’s widow, to-wit: in 1843, there was a partition of his real estate among his heirs — whether made by the heirs, or by commissioners appointed by the court, does not appear. It must be taken, however, as a conceded fact, proved if not admitted, that in 1843 an arrangement was made by which Jacob Miller was to have assigned to him in the division of the said real estate, that portion which had been conveyed to him and William Kite jointly by Stevens and wife in 1831. and that S. B. Jennings was to have assigned to him that portion of the real estate *which had been conveyed to him and William Kite jointly by Jacob Conrad, in 1837. In pursuance of this arrangement, and to carry out the partition then agreed upon, deeds were executed by Jacob Miller and wife and the other heirs at law o'f William Kite (except Joseph, who was a minor), conveying all their interest in the tract of land of which Kite and Jennings were the joint owners to S. B. Jennings, and a similar deed was executed by Jennings and wife and. the other heirs of Willlia.m Kite (except Joseph Kite, who was a minor), conveying all their interest in the lands of which William Kite and Miller were the joint owners to Jacob Miller. In these deeds both Mrs. Miller and Mrs Jennings united. There was a privy examination of both duly made and certified, and the deeds duly recorded. Under these deeds Jacob Miller and S. B. Jennings took possession of said lands and held the same under this recorded title for more than forty years.
It is now claimed, after the lapse of forty years, that these deeds thus executed and recorded did not convey an absolute title to Miller and Jennings, but that they took the title in the same as trustees for their wives, and that though the real estate so conveyed by said deeds was conveyed to them absolutely, yet being the real estate descended to their wives from their father, it was held by their husbands in trust for the benefit of their wives and their heirs. Now, the evidence mainly relied on in the case before us to establish this trust is that of S. B. Jennings, the father of appellants, given in a suit in which his creditors are seeking to assert the lien of their judgments against land which he has held under a recorded title and possession for forty years. It must be noted here that the answers of his children, the defendants, to the bill of his creditors, are not responsive to the bill, but set up, by affirmative allegations, the defence upon which they rely. These answers are entitled to no *weight, and their allegations, unless sustained by proof clear and certain, can have no effect in determining the existence of the trust which thev now assert.
The whole evidence relied upon by the appellants to establish a resulting trust in the face of deeds absolute upon their face, are the depositions of their father, S. B. Jennings, and their mother’s brother, Hiram A. Kite.
As to the deposition of the former, leaving out of view and without comment the interest which an insolvent father would have in securing his estate to his children instead of his creditors, it is to be noted that it is the deposition of an old man in feeble health, who says his “memory is not clear,” testifying as to transactions which occurred more than thirty years before. His deposition shows, not only that his memory is not clear, but totally defective when tested as to very recent and important events. He does not remember statements made in his answer filed in a suit in the county court just three years before he was examined, nor does he remember the facts that he ever signed or swore to such an answer. He has no recollection of having ever seen an important paper which he filed as an exhibit with his answer, and which shows the basis of the division of the real estate of William Kite among his heirs, and which paper, itself, shows that the theory now advanced after thirty years, that Miller and Jennings were to hold the land conveyed to them in such division, in trust for their *257 wives and children, had no existence at that time.
So much for the evidence of Jennings, the father. The only remaining evidence to support this so-called resulting trust, is that of Hiram Kite, a brother of Mrs. Jennings. He proves literally nothing in support of this claim. On the contrary, his evidence is in favor of the claim of the appellees. He proves that there was a partition of the real estate among the heirs after assigning dower to his mother, and that *the deeds executed by their heirs of Jennings and to Miller were made after that partition, and to carry it out. He says, whether this partition was made by commissioners of the court or the adult heirs, he does not remember.
In answer to a question very suggestive and leading in its character, to-wit: “Were these tracts of land valued and allotted to S. B. Jennings and Jacob Miller on account of the interest which their wives held in the estate of William Kite?" he says, “in part, I suppose.” Tn answer to another question, to-wit: “You say that S. B. Jennings got the land mentioned in the deed to him (Exhibit A) ; how did he get. these lands ?” he says: “There was a price set upon all the lands at the time, and all over what was coming to him on the divide he bought from the heirs ”
These are the depositions upon which the defendants alone rely to maintain the claims set up in their answer. I think they fall very far short of proving a resulting trust. Indeed, the evidence of Hiram Kite, taken in connection with the admissions in the answers of the defendants, strongly supports the claim of the appellants, that the lands they seek to subject to their liens were held, as they purport on the face of the deed to be held, as the absolute property of S. B. Jennings. It is admitted that the real estate of William Kite was sufficient to give to each of his heirs between four and five thousand dollars, and that the personal estate was large enough to give each between two thousand five hundred and three thousand dollars. They were each entitled, after the death of their mother, to real estate valued at $6,800. Now, when they came to divide the real estate, it was natural that they should pursue that mode indicated by the old paper writing marked X, produced and filed by Jennings, and no doubt written as a memorandum of that partition, and assign to Jacob Miller that portion of the real estate *upon which he resided, and which was conveyed to him and William Kite, jointly, in 1831, and to S. B. Jennings that portion of the land on which he resided, and which had been conveyed to him and William Kite, jointly, by Conrad, in 1837.
No doubt these parties made up out of the personal estate coming to their wives, and of which this appropriation was a reduction into possession, the shares of the other heirs equal. This is indicated by the fact that in this very suit is filed a bond of Jennings to Malinda Kite, which he admits was given to equalize the division of Kite’s estate. At any Tate, these all united (except one who was not of age) in conveying their interests in these two tracts of land respectively, to Jacob Miller and S. B. Jennings. In the deed to Miller Mrs. Jennings united with her husband, and in the deed to Jennings Mrs. Miller united with her husband. Both deeds are duly recorded with certificates, in due form, of the privy examination of the wife in each case.
These deeds, absolute on their face, will not be converted into trusts in favor of the wife, except upon the most clear, positive and satisfactory proof. No such proof is furnished in this case, but on the contrary, the evidence is, in my opinion, as above shown, so vague, contradictory and uncertain, as to furnish no foundation upon which a court of equity can erect a resulting trust.
In Phelps v. Seely, 22 Gratt. 573, Judge Bouldin delivering the opinion of the court, said: “A resulting trust may be set up by parol testimony against the letter of a deed, and a deed absolute on its face may be like testimony be proved to be only a mortgage. But the testimony, to produce these results, must in each case be clear and unquestionable. Vague and indefinite declarations, made long after the fact, have always been regarded, with good reason, as unsatisfactory and insufficient.” The same principles, enforced by numerous *authorities, were reaffirmed in Blose’s ex’or v. Miller, decided upon facts growing out of the same transaction, and almost entirely similar (certainly no stronger) with those in this case.
It would be grossly inequitable and subversive of all security of rights, if upon the vague and uncertain testimony of witnesses taken thirty years after the transaction, the recorded titles of over a quarter of a century are to be overthrown.
The court below has confirmed to Mrs. Jennings’ heirs all the real estate to which she was entitled. She was one of seven children of William Kite, and entitled to one-seventh of the tract of land which the other heirs conveyed to her husband by the deed filed with the record. That has been secured to them by the decree appealed from. •
Upon the whole, I am of opinion that there is no error in said decree, and that the same ought to be affirmed.
ANDERSON, J.
This record throws light upon the case of Miller v. Blose’s ex’or, and the two causes ought to have been heard together. I had not looked into it until after that case was decided; and I find much in it to strengthen and confirm the views I had taken of that case.
William Kite was the owner of a very considerable estate in land and slaves and other personal property, in the county of Rockingham. He died in the year 1838, intestate, and Conrad, his son, and Jacob Miller, his son-in-law, qualified as administrators of his estate. He left a widow, Elizabeth Kite, and seven children; Sarah, wife of Jacob Miller; Malinda Kite; Anne Jennings, wife of Dr. Simeon Jennings; William C. Kite, Conrad H. Kite, Hiram 'A. Kite, and Joseph H. Kite, the latter a minor.
*258 The appellants, the heirs of Mrs. Jennings, aver that *soon after the death of William Kite, a partition was made of his estate. In proof thereof, Hiram A. Kite testifies that soon after the death of William Kite the heirs made a division of the land and negroes amongst themselves. He thinks it was in January, 1839. He says another partition was made in 1843, after the death -of the widow, when they executed deeds to each other severally, for the lands which had been allotted to them in the partition. The heirs of Mrs. Anne Jennings allege that the real- estate of William Kite was composed of a number of different tracts, and was valued by his children and heirs at law preparatory to a partition of the same; and they set out specifically the valuation which was put on each tract, amounting in the aggregate to thirty-five thousand and sixteen dollars. His personal estate they say was valuable,-and his whole estate was said to be worth not less than $60,000. He was not indebted (if at all, very inconsiderably), beyond what he was still owing for lands purchased from one Stephens in 1831, and conveyed jointly to him and his son-in-law, Jacob Miller; and for lands purchased in 1837, and conveyed jointly to himself and his son-in-law, Simeon B. Jennings. According to this valuation, Mrs. Jennings and each of his children were entitled to a share in the same, of not less value than $6,000.
In the first partition all the lands’ were parcelled out and disposed of. Seven hundred and thirty-two acres were allotted to Mrs. Miller, valued at $8,000; four hundred and fifty-eight acres to Conrad Kite, valued at $8,000; five hundred and fifty-nine acres allotted to Mrs. Jennings, and valued at $7,000; two tracts to William C. Kite, the value not expressed in the deed, but proved by Hiram Kite to be $800; and two tracts to Hiram Kite, for which a deed was doubtless executed, but which I do not find in the record, which he testifies were valued together at about $3,720; and the residue of the lands *were assigned to the widow as dower, and were valued at $7,666, and after her death were sold to Conrad and Hiram Kite at that price, doubtless to raise a fund to be used with the personal estate in equalizing the heirs in partition' — the whole real estate aggregating $35,186.
This evidence conclusively shows that the lands were valued by the heirs, as alleged in the appellants’ answer, at $35,016, at least, and there is no ground for the imputation that it was manufactured for the occasion. It is then an established fact in this cause that the real estate of William Kite, of which he died seized, and which descended to his heirs subject to the widow’s dower, was estimated by the heirs, amongst themselves, to be worth $35,000, which would give to each of them in severalty lands to the value of $5,000. Whether they were worth so much or not, is immaterial, if, in the partition, the heirs agreed to this valuation. But they do not appear to have been overestimated, for Conrad sold to Price the lot which had been allotted to him for $8,000, the price at which it had been allotted to him; and the price at which Conrad and Hiram, after the death of the widow, purchased the land which had been assigned for dower, was, as is proved, the price fixed by the heirs.
Mrs. Elizabeth Kite, the widow of William Kite, deceased, died on the 1st of January, 1843, and a deed from the heirs of William Kite, except Sarah Miller, and Joseph Kite, a minor, conveying to Jacob Miller seven hundred and thirty-two acres, was acknowledged before William B. Yancey and Jacob Rush, justices of the peace for the county of Rockingham. A similar deed was executed by the heirs of William Kite, deceased, except Anne Jennings and Joseph Kite, a minor, conveying three tracts of land, containing together five hundred and fifty-nine acres, to Simeon B. Jennings, for the consideration expressed on the face of the deed of $7,000, which bears date on the 21st of January, 1843, and is *acknowledged the same day. A similar conveyance is made by deed bearing date 18th of January, 1843, by all the other heirs, except Joseph, conveying lands to William C. Kite. And on the 18th of January, 1843 — the same day —a deed of conveyance was made by the other heirs, except Joseph, to Conrad H. Kite and Hiram A. Kite, of the lands which had been assigned to the widow, now deceased, for her dower, which deed was acknowledged before the same justices on the 21st of January, 1843, before whom, on the same day, all the foregoing deeds were acknowledged.
Where the lands conveyed by the foregoing deeds allotted to the parties respectively to whom they are conveyed in the partition of the estate, real and personal, of William Kite, deceased, or were they acquired by purchase? Were the deeds executed as the results of a partition of the decedent’s lands and personal estate amongst his heirs, or were they executed to the grantees as purchasers?- To narrow the enquiry and to bring it home to the case in hand, did Jennings acquire the land conveyed to him by virtue of a contract of sale and purchase, the consideration moving from him, or was there a parol partition of the lands and negroes of the decedent amongst his heirs and distributees? And in such partition were the lands which were subsequently conveyed to Jennings allotted to his wife? I propose briefly to pursue these enquiries.
And first, there was a parol partition made of the lands and negroes, and probably a partial division of other personal property, in 1839, which was not completed until after the death of the widow, on the 1st of January, 1843. Such a parol partition was valid. Deeds of partition between parceners are not absolutely necessary. They may mark and establish the dividing line between them, and prove it by other competent evidence, and will, from the time of establishing the liríe, be seized *in severalty. Coles v. Wooding, 2 Pat. & Heath, 189; Lomax Digest, 134; 2 Min. Inst. 2d ed. 707; Va. Code, ch. 112, § 1; ‘Jones’ devisees, v. Carter, 4 Hen. & Munf. 184; Bryan *259 v. Stump, 8 Gratt. 241; 2 Min. Inst. 488; 2 Bl. Com. 188-9; see 9 Gratt. 1; 4 Kent’s Com. 4th ed. 366-7. And where there are several tracts, as in this case, each heir is not entitled to have his share laid off in each tract. Litt. § 251; Earl of Clarendon & als. v. Hornby, 1 P. Wms. 446; Hagar v. Wiswall, 10 Pick. R. 152. But the real estate at $35,000, and Mrs. Jennings’ share would be $5.000, and the lands allotted to her were consequently valued at $2,000 above her aliquot share of the real estate.
But was there a partition? Hiram Kite, who has no interest in this controversy, testifies that they made a division soon after his father’s death of the land and negroes, there having been a sale of the personal estate. He is asked if the division was made at the time the deeds were made, January 21st, 1843? He answers: “They made a division of the land and negroes soon after my father’s death, I think in January, 1839.”
There are several other witnesses who testify to the same effect, but there is other evidence which does not depend on slippery memory, which it seems to me ought to be conclusive of this question. It is the deed of all the heirs of William Kite, except the minor, to George W. Price, which purports to bear date on the 1st of January, 1843. but is acknowledged on the same day (the 21st of January) the other deeds are acknowledged, and before the same justices. The certificate of acknowledgment describes it as bearing date the 18th of January, and either that, or the date of the deed as it appears in the copy in the printed record, must be a mistake. Be that as it may, it is not material to the purpose for which I refer to it. The deed is a conveyance by all the heirs of William Kite, deceased, to the said George *W. Price, in the following language: “A certain tract or parcel of land containing four hundred and fifty-eight and a half acres, be the same more or less, lying, &c., * * it being the tract that was allotted to the said Conrad H. Kite by the legatees of William Kite, deceased, and bounded as follows,” &c. The consideration is “the sum of $8,000, current money of Virginia, to them in hand paid by the said George W. Price,” &c.; also the interest, (fifteen-sixteenths, it is presumed to be, the last syllable having been obliterated by the burning,) which all the heirs of William Kite held in “Swift Run turnpike, it being also allotted to him, the said Conrad PT. Kite (evidently the words ‘said Conrad’ being obliterated by the burning), by the legatees of William Kite, deceased.” It appears then, that previous to the date of this deed, there had been a partition of the lands of William Kite, deceased, and that lands to the value of $8,000 had been allotted to Conrad Kite, and that in addition to the lands, fifteen-sixteenths of his interest in the Swift Run turnpike, the value of which does not appear, had also been allotted to him. The deed does not state when the partition and allotment was made, but it was evidently anterior to the deeds, and it is corroboratory of the parol proof, that it was made in January, 1839, soon after the death of William Kite. This was a partition in fact, though incomplete, of the real and personal estate, estimated to have been worth not less than $60,000, making each share worth $8,571 and a fraction. It was not completed until January, 1843, after the death of the widow.
It is true that the lands conveyed to Jacob Miller were conveyed in 1831 by one Stevens, from whom they were purchased, to William Kite and Jacob Miller jointly, and possession was given to Miller and wife, and the lands conveyed by the heirs to S. B. Jennings had been ^conveyed by one Conrad, from whom they were purchased in 1837, the year before the death of William Kite, to William Kite and Jennings jointly, and possession was given to Jennings and his wife. Yet the proof is that in the partition, Miller and Jennings both being present, those lands were treated as lands belonging to the estate of William Kite. Jennings, in answer to an interrogatory propounded to him by the plaintiffs in that suit (appellees here), testifies with regard to the lands conveyed to him and William Kite jointly, that all the purchase money was paid by William Kite, and by his administrators since his death; and in the division of William Kite’s estate, which occurred in 1839, .the said lands being held and considered as a part and parcel of his real estate, were allotted (he says), “to my wife, the daughter of said Kite, as her interest in the real estate of her father. And the deed from Jacob Miller, &c., as legatees of William Kite, was made to me in consideration of my wife’s said interest — all of the legatees making deeds of exchange to those to whom lands were allotted in said division.” I have not a doubt that this is a truthful representation of the case. Tt is in perfect harmony with the whole transaction, and with the testimony In this case, and in the case of Blose v. Miller. Why would Miller be charged in the. partition with $8,000, the value of the entire tract, if the half of it was his? And why would Jennings be charged with $7,000, the value of the entire tract allotted to to him in the partition of William Kite’s estate, if the half of it was his, whilst Conrad was charged with just the lands he got from the estate, valued at $8,000 ? That it was a partition of William Kite’s estate is shown by the deed from the heirs to George W. Price, and Miller and Jennings were charged with the value of the entire lands conveyed to them severally, just as Conrad Kite was charged with the value of the entire lands which were conveyed by the heirs to George *W. Price, his vendee. The lands conveyed to the two former, in their entirety, were treated as parcels of the estate of the decedent, just as the lands were which were allotted to Conrad Kite. And why would the heirs have undertaken to convey lands in their entirety, and Miller and Jennnigs have consented to take a conveyance from them, if half the lands were theirs truly and justly and beneficially, by the conveyances of 1831 and 1837 respectively?
*260 The conveyances made by the heirs to them is an assertion by the deeds, that the lands were, in their entirety, a part of the estate of William Kite, and their acceptance of the conveyances is an acknowledgment by deed on their part, that they were, and more es-specially as they are not charged with only a moiety of the price of them respectively, but with the entire price. I am of opinion, therefore, that the transaction, as evidenced by the deeds, fully sustains the testimony of Dr. Jennings, which is also in harmony with the testimony of Hiram Kite, a disinterested witness. But there is nothing in this record to impeach Dr. Jennings’ veracity, if it were competent for the appellees to impeach their own witness, and upon whose testimony they rely for another purpose, to-wit: to prove the consideration of Malinda Kite’s bond. He is not even an interested witness. If he has any pecuniary interest it is with the appellees, for it is the interest of a debtor to pay his "debt;;. Unless it is right to hold that a man is not to be credited because his testimony will benefit his children, there is no ground to discredit this witness. There is not a particle of testimony in this cause tending to impeach the character of Dr. Jennings. It Is his misfortune to be unable to pay his debts — a misfortune, I regret to say,-that has befallen many of our most upright citizens. He seems to be desirous that whatever property is rightly and lawfully his, shall be subject to *the payment of his debts, but is unwilling to appropriate the property of his children, which they justly and lawfully derived from their deceased mother and not from him, to the payment of his debts. I do not hesitate to say that I can perceive no cause in that to discredit him.
But it is said that his deposition taken by the plaintiffs (the appellees here), on the 29th of August, 1873, nearly four months after his answer to the plaintiffs’ interrogatories, shows such a failure of memory as to divest his testimony of moral weight. The defendants’ counsel objected to the plaintiff retaking this witness’ deposition without leave of the court, on the ground that his deposition had been taken on two previous occasions. But the plaintiffs persisted in retaking his deposition, and I am free to admit that it exhibits a melancholy failure, if not wreck of memory, since his previous depositions were taken, and I do not rely upon it at all in the investigations which I have made of the cause, and in the opinion I have formed.
The plaintiffs, in the examination of their witness, call his attention to a paper which he exhibited with his answer to the bilj of Annie E. Jennings and others against him, designated by the letter X, and ask him if it is in his handwriting, and when it was made. He answers that he thinks it is in his handwriting, but is not positive, but has no idea when it was made. He seems to have 'no recollection of it, and to know nothing in relation to it now. In his answer to the appellants’ bill against him in the county court, filed on the 4th day of September, 1871, nearly two j^ears before, he refers to this paper as an old memorandum in .his handwriting, which he exhibits as a part of his answer for a pretty correct setting forth of the matter. This paper is in these words: “Jacob Miller, Jr., and S. B. Jennings, have this day had the following propositions made to them (it relates to the time of the partition ‘this day’): Jacob Miller is *to take the land on which he now .lives at $8,000, the half he now holds at $4,000, and he (and all the rest of the legatees who shall have received $4,000 in hand, either in land or other effects,) shall pay to the rest of the legatees, who shall be deficient, the lawful interest on the deficiency until all are made equal in the sum of $4,000. Then he shall, twelve months thereafter, pay $800 down, and $800 annually to the estate, until the sum of $4,000 is paid. S. B. Jennings is to take the land on which he lives at $7,000, and paid in the same manner of Jacob Miller’s, with this difference, that he is to pay $600 annually.”
This paper seems to be greatly relied on by the appellees, but it is no evidence against the appellants. It is exhibited with the answer of the defendant, S. B. Jennings, to the plaintiffs’ bill, with the affirmative allegation that it is an old memorandum in his handwriting, and he exhibits it as “a pretty correct setting forth of the matter.” It was no evidence against the plaintiffs in that suit, and was entitled to no weight against them, unless proved; and the plaintiffs in this suit could not make it evidence against them by transferring the record of that case to this suit, and making it a part of their bill. But if said paper had been signed by Dr. Jennings, or had been proved to have been a proposition made to Jacob Miller himself by the other heirs and accepted by them, it falls far short of sustaining the appellees’ pretensions. I beg to riiake the following comments on.it:
First. It implies in the offer by the heirs that he may take the land on which he lives at $8,000, that no part of it rightfully belongs to him, but that it all belongs to the estate, although half he holds.
Second. But that half which he holds he is to take at $4,000, as so much of the real estate of William Kite as is then apportioned to him, but shall pay interest, as all the other legatees who shall have received $4,000 in *hand. either in land or other effects, shall be required to do, to the legatees who have not received $4,000, on the amount they are deficient, until all are made equal in the sum of $4,000.
Third. And for the other half of the land which is apportioned to him, he shall, after twelve months, pay to the estate $800 down and $800 annually until the sum of $4,000 is paid, which covers the value put upon the entire tract — $8,000, the exact value of lands Conrad received.
Fourth. The payment of interest to the heirs who have not received $4,000, on what they are deficient, until all are made equal in the sum of $4,000, is an assertion that the moiety of the land which he holds is an apportionment from the estate of $4,000, and that he holds it, not by virtue of the deed *261 from Stevens to the decedent and himself jointly, but in right of his wife’s interest in the real estate of her father; and
Fifth. The payment by him of $800 annually to the estate until he has paid $4,000 for the remaining moiety of the land, is to raise a fund for further distribution or partition, it being required to be paid to the estate. And his wife’s interest in the whole estate, real and personal, being at least $8,000, there need be no actual transfer of money, as it would be to pay it to the estate just to be paid back to him. The whole paper shows, as to Miller, that he had no beneficial interest in the seven hundred and thirty-two acres of land on which he lived, in his own right, but that he got it in the right of his wife, for her interest in her father’s estate. And the provision made for Jennings is liable to exactly the same construction and the same results. And this paper, which is introduced by the plaintiffs in this suit, and relied upon by them, and consequently may be accepted by the appellants as evidence, in my opinion fully sustains the testimony of Jennings and the pretensions of the appellants.
*But it is contended that the deeds show upon their face (except, I presume, the deed to Price) that it was a sale and purchase, by which the grantees became severally invested with these lands, and not a partition, because, first, they purport to be deeds of bargain and sale, and do not purport to be deeds of partition, and secondly, because they purport expressly to be for a monied consideration. It must be considered that these deeds were evidently not prepared by a lawyer, for they designate the heirs as legatees, which no lawyer would have done. But to ascertain what was the intention of the parties to them, they should be read together, and in the light of the surrounding circumstances. They are all made by heirs of William Kite, and dispose of all the real estate which they inherited from him by conveying it in parcels to heirs and to the husbands of two of his heirs. No part of it is conveyed to a stranger, except in one instance, and all the heirs except the one who was in his minority, unite in a deed conveying to him. George W. Price, not lands then belonging to the estafe, but the lot which had been allotted to Conrad Kite, and which had become his property in severalty by virtue of the parol partition which is proved to have been made in 1839. doubtless because he had sold the lot to Price and desired the heirs to convey directly to his grantee, instead of to himself, and these facts appear on the face of the deed, and cannot, [ think, be reconciled with any hypothesis which negatives the fact of a partition. It was not only a partition of real estate, but also of the valuable personal estate, together, which our statute authorizes; and not only no stranger gets land in the disposition of it bv the heirs, but no grantee gets more land than the value of each heir’s share in the real and personal estate. If it had been intended to be a sale, and not a partition, it is fair to presume that some parcels of the land would have been sold to strangers outside of the *family, and that the grantees would' not have been limited not to exceed ia any instance the value of each heir’s share in the real and personal estate. It being a partition of real and personal estate, it is very natural that some of the heirs would be willing to take their whole interest in real estate, some of them part in real and part in personal,, and others altogether in personal; and it is-not important for us to know how or when they were equalized. The presumption is that the partition was completed at the time these deeds were executed, which vas more than five years after the death of the intestate, and his administrators were present and participated in the partition. But how or when that was done it is not material for us to enquire. That it was done, and to the satisfaction of all, we may well presume, for we hear of no complaint; all have acquiesced in what was done, even Joseph Kite, who was then in his minority, as appears from his answer in this cause.
It seems that one of them, and only one, Malinda, has not received all that was due to her. It seems that she chose to take the bond of Dr. Jennings for what she was entitled to receive from his wife’s share of the personal estate with which it was chargeable ($540.47), to equalize her with the rest of the heirs, instead of receiving it in money from the personal representatives. Great stress has been laid upon this circumstance to show that Dr. Jennings was the purchaser of the lands allotted to his wife, valued at $7,000, I think the conclusion is not a logical one. The-bond was executed on the 19th of March, 1839, long before the deed was executed, and being a charge upon the land which Mrs, Jennings got, as the amount she was to contribute for the equalization of Malinda with the rest of the heirs, the partition must have been made prior to the date of the bond; and it strongly confirms the testimony of Jennings and Hiram Kite that it was made in January, 1839, and the logical ^inference-is, not that Dr. Jennings purchased the-whole of his wife’s interest, worth $7,000, but that he had used $540.47 of his wife’s personal estate, and had reduced that much of it to possession, and gave his bond for it to Malinda Kite, which he never paid.
But now to return. In the light of all the circumstances surrounding the execution of these deeds, can we say that they show upon their face that they were executed to carry into effect contracts of sale and purchase, and not in pursuance of a partition made between the heirs themselves, because they are not written as a lawyer would have prepared them, setting out the partition in terms, but are written as deeds of bargain and sale are ordinarily written3 It is probable the drafts-man would not have known how to draft a formal deed of partition. The object of the deeds was to vest in each of the grantees in severalty, title to a specific parcel of all the lands which they had before held in common, or cooarcenary. And this was as effectually done by the deeds as they were framed, as if they had been most formally worded as deeds of partition. These deeds are as effectual to *262 carry into effect the partition as they would be to carry into effect a sale and purchase. We cannot logically or reasonably conclude, therefore, that they are incompatible with the fact of a partition, especially when all the surroundings show that it was a partition and not a sale and purchase.
Nor, secondly, is the circumstance that they express the value in money in each case except one, as the consideration of the conveyance that the heirs had agreed should be the valuation of the land conveyed, incompatible with the fact that they were executed to carry into effect the parol parti-’ tion. It is no contradiction of the face of the deed to say, that the consideration which passed from Dr. Jennings to the heirs, his grantors, *was five thousand dollars, the value of his wife’s undivided interest in the real estate of her father, which she contemporaneously conveyed to other heirs, and two thousand dollars of her interest in the personal estate, which the administrators, being present and parties to the partition, were authorized to pay over to such of the heirs as it was determined and agreed should be entitled to receive it. And the bond to Malinda for $540.47, is a very strong circumstance to show that the definite amount which each one was to pay, and who was Jo receive it, was determined. And the administrators were bound to pay these several sums to the heirs and distributees, who were entitled, respectively, to receive them, as was determined in the settlement and partition amongst the heirs themselves. And the fact that Malinda chose to take Dr., Jennings’ bond for the amount that was coming to her from his wife, would operate as a release to the administrators from their obligation to pay it to her, and would authorize them to pay it to Dr. Jennings, and so would be a reduction to his possession, or rather a purchase of that much of his wife’s personal estate. It would be a very slight circumstance from which to infer that he had purchased and paid $7,000 for the five hundred and fifty-nine acres allotted to his wife. Such an hypothesis, also involves other insuperable difficulties. His wife was entitled to $5,000 of the $7,000 in real estate. He might become the absolute owner of her personal estate by reducing it to possession, but could not of her real estate. Well, she had, by uniting in the deeds, conveyed her undivided interest in the real estate worth $5,000, in part consideration for the five hundred and fifty-nine acres which had been allotted to her, and for the balance of the consideration had surrendered $2,000 of her interest in the personal estate. Now, suppose her husband, by reducing to possession her personal estate, could pay two thousand dollars of the consideration *for the land . conveyed to him, how did he pay the $5,000, the residue, if he did not pay it in his wife’s land? He would hardly have paid it out of his own pocket if he had had the money, which it seems he had not, when his wife was entitled to it in land. And if he had, to whom would it have been due but to his wife? It is not pretended that he paid $5,000 to her. But if he could have lawfully made a contract with her for the purchase of her land which she inherited from her father, where is the evidence of such contract of purchase? I have always been under the impression that a married woman could only part with her real estate in the mode prescribed by the statute, upon a privy examination; and that her consent to its transfer could not be shown by her declarations in any other mode, much less be inferred or presumed from her acquiescence in the claim of her husband, for however long a period. Here there is no evidence that she ever parted with her inheritance to her husband in the only mode under the statute by which she could have parted with it; or, in fact, that she in any way consented to or acquiesced in the claim to her land now set up by her husband’s creditors.
She united, it is true, in the deeds conveying to her co-heirs the parcel of the real estate set apart to them respectively, which had descended from her father; and that she did, in consideration of the parcels of land which had been allotted to her. The consideration of the deed made of her land to her husband, is stated in the deed to be $7,000. It does not say in money, and the heirs — the grantors — acknowledge the receipt of it. That is not inconsistent with the fact. They had received it in Mrs. Jennings’ undivided interest in the lands, valued at $5,000, which, by contemporaneous deeds she had conveyed to her co-heirs, and in $2,000 of her interest in the personal estate which she had surrendered for equalizing the heirs with her who had received less land *and those who had received no land. The consideration for the land which was allotted to her, and which was conveyed to her husband, was her interest in the real estate of her father, and so much of her interest in the personal estate as would make it $7,000. I don’t think there ought to be a doubt of that.
The evidence in this record, documentary and oral, I think, plainly shows that Mrs. Jennings was entitled to at least five-sevenths of the land which was conveyed to her husband, and to the whole of it, unless her husband had reduced to his possession her interest in the personal estate, which was the consideration of the remaining two-sevenths. The evidence does not establish satisfactorily that Jennings ever reduced to possession his wife’s interest in the personal estate with which he paid partly for the land conveyed to him. There is .some ground for the assumption in the deposition of Hiram Kite in answer to the question how S. B. Jennings got the lands conveyed to him. He says, “there was a price set upon the lands at the time, and all over what was coming to him in the divide he bought from the heirs.” Well, five-sevenths was coming to him, or rather to his wife, in the divisions of the real estate. It could not be coming to him in any sense, except .in the right of his wife, and the excess, which was two-sevenths, he bought, according to this witness; and as it was doubtless paid for out of his wife’s *263 personal estate, it may be considered as evidence of the reduction of his wife’s personal estate to his possession. But whether so or not, if he bought it and paid for it, two-sevenths would be liable to the debts of his creditors. And upon this theory, that he bought the two-sevenths, we may conclude that he gave his bond to Malinda in part payment of it. The most, I think, that can be claimed for the creditors of Dr. Jennings is the two-sevenths of the five hundred and fifty-nine acres of land, and his life estate, by the curtesy, in the live-sevenths and "the fifty acres which are no part of the aforesaid tracts, and are not claimed by the heirs of Mrs. Jennings. This, I think, is a most liberal disposition of the case for the creditors of Dr. Jennings. I have not a doubt as to the right of the heirs of Mrs. Jennings to five-sevenths of the lands in controversy, subject to their father’s life estate by the curtesy. Upon what just principle it is reduced by the decree to an undivided fourteenth interest in the five hundred and fifty-nine acres, I cannot comprehend. Mrs. Jennings was undoubtedly entitled to one-seventh of the whole real estate of which her father died seized. She has been induced to unite in deeds, with the other heirs, in conveying her interest, which was an undivided one-seventh in all the other lands, to the heirs to whom they were parcelled out in the partition or settlement, in consideration that (ivc-sevenths of the lands in question, which would be her proportion according to the value of her undivided interest in the real estate, should be allotted to her in severalty; and to hold now, that she is entitled to only one-seventh in the five hundred and fifty-nine acres, valued at $8,000, would be to give her only one-seventh in the five hundred and fifty-nine acres for the one-seventh which she was clearly entitled to by inheritance in all the lands which descended from her father, estimated to have been worth at least thirty-five thousand dollars. She has parted with all her interest in the other lands to other heirs, upon consideration that she was to have her whole interest concentrated and vested in the lands in question. And the decree holds her to the commences of her undivided interest in the lands worth $5,000, but takes from her or her heirs the_ consideration on which alone she united in those conveyances. The decree makes it one-fourteenth instead of one-seventh, of course upon the idea that her husband ivas a joint owner with her father in the said laud, a claim which her husband had not the conscience *to make for himself when the lands were partitioned, when it would
have been made, one would think, if it could have honestly been made, the joint conveyance having been made to him and his father-in-law not two years before this partition, and when the whole transaction was known to all the heirs and fresh in their recollection. No such claim was then made by Dr. Jennings, but absolutely renounced by him and disclaimed to this day, and yet this decree gives it to him.
It was contended that a moiety of the lands was an advancement by the father to the husband of his daughter. But I do not think_ that can be maintained. He did not take it as an advancement from his wife’s father;_but he took it as a joint purchaser with him from Jacob Conrad, the grantor. There is nothing in the transaction or the proofs to show an intention of the father to advance him with a moiety of the land. On the contrary, there is everything to repel such a presumption; it was his intention that Dr. Jennings should pay for a moiety of the land, which he admits and testifies that he failed to pay any part of it. And the same having been paid by William Kite, or his representatives, it was a charge upon his moiety of the land. And being so, it is very reasonable, as he and Hiram Kite both testify is the fact, that when the lands were partitioned he consented that the entire lands so conveyed to him and William Kite jointly, should be valued and partitioned as lands of William Kite’s estate.
If these transactions had occurred shortly before the death of Mrs. Jennings, which occurred in 1865, the rights of her heirs could hardly have been questioned. And yet;> she being a married woman, the lapse of time cannot affect the right of her heirs, they having instituted suit in a reasonable time after her death. Lapse of time will not be laches, if the party was under disability.
(Perry on Trusts, 1st ed. § 230). The husband has been *in possession, but his possession was not inconsistent with his wife’s claim of right, set up by her heirs; and if it was, acquiescence cannot be imputed to a married woman. Her husband had possession under the deed from the heirs of William Kite, which was of record, and not under the joint deed to decedent and himself of 1837, which was renounced by him when he consented that the entire tract so conveyed should be valued and taken into the partition as a part of the decedent’s lands, and actually accepted it at the price put on the entire tract, not upon a moiety, as and for a part of his wife’s share of her father’s estate. For the decree after this, and when Dr. Jennings to this day disclaims any right or title under the joint deed, and has never claimed any since the death of William Kite, but as we have seen disclaimed it when the lands were partitioned amongst the heirs, T confess is incomprehensible to my mind. This deed made to Dr. Jennings by the heirs of (William Kite, except the minor and his wife, who did not unite in it, was sufficient to charge even a subsequent purchaser with constructive notice of the wife’s right.
The fact of the deed being of record for thirty or forty years cannot affect the rights of Mrs. Jennings, she being under disability during that whole period, nor her children, they having instituted suit against S. B. Jennings to assert their rights within the time limited by law after the death of their mother, when their rights became vested.
Unless Mrs. Jennings or her heirs are barred by the execution of the deed to her *264 husband by her co-heirs, I cannot apprehend the shadow of a doubt as to the right of her heirs to at least five-sevenths of the land in question, subject to their father’s life estate by the curtesy. As we have seen, she is not a party to the deed that conveys the land to him, and has never acknowledged on privy examination the conveyance of her title, which was clear *and unquestionable, if not to the whole, to at least five-sevenths of these lands. It is true that she united in the other conveyances, and it is very probable she would have united in this too if she had been told to do so. We all know how readily a dutiful and trustful wife is disposed to confide all business matters to the disposal of her husband, and to do whatever he and the men who have it in charge direct. And if she had been joined in the deed to her husband she would doubtless have considered it all right, and would have acknowledged that too. But she did not do it. She was clearly entitled to at least five-sevenths of the land, which had been four or five years before allotted to her in the partition. But the deed was made by the other heirs to her husband, for five-sevenths of which he had not even a pretext of title. It was evidently done without knowledge as to its effect upon the rights of the wife, or without due consideration. I have no idea that there was any intention of any of the parties to defraud Mrs. Jennings of her rights. But if it was not a conveyance to the husband as to at least five-sevenths, in trust for his wife, it was an actual fraud upon her rights, and a court of equity would hold the husband a trustee for his wife. Brown v. Lynch, 1 Paige Ch. R. 147; Barnesly v. Powell, 1 Ves. Sr. R. 283; Young v. Peachy, 2 Atk R. 254; Thymn v. Thymn, 1 Vern. R. 296. Constructive trusts arise (says Professor Minor) independently of the intention of the parties by constructio'n of law, being fastened on the conscience of him who has the legal estate, in order to prevent what otherwise would be a fraud. They occur not only when property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired; but it is contrary to the principles of equity that it should be retained, at least for the acquirer’s own. benefit. 2 Min. Inst. (1st ed.) 206, 207, citing 1 Lom.
Dig. 233; 1 Spence’s Eq. Jur. 511-12. *A court of equity will construe a deed so made to the husband, the consideration moving exclusively from her, as made in trust for her, and will regard the husband as trustee for the wife. We set up a trust in Snavely v. Pickle, 29 Gratt. 27, though the grantee had been in possession under the deed since 1845. And a court of equity will be vigilant to secure to the wife her rights. Even if Mrs. Jennings had been divested of her inheritance, in the mode by which a married woman may under the statute part with her real estate, a court of equity will closely scrutinize the act. Judge Moncure, in Statham v. Ferguson’s adm’r & als. 25 Gratt. 28, 43. When land is sold for the purpose of partition, the share of the proceeds belonging to a feme covert will be treated as land, and cannot be paid to the husband except with her assent upon a privy examination. Hughes ex parte, 1 Dev. Ch. 118; Snell v. Jamison, 2 Dev. & Bat. Ch. 2 Hill Ch. 646; 5 Iredell Eq. 396. There is nothing in the case of Phelps v. Seely which is in conflict with the foregoing. From my recollection of that case it was an attempt to raise a resulting or implied trust against the purchaser of the property in favor of the party claiming the trust, although the consideration did not move from him, but from the purchaser; whilst in this case the consideration of the deed vesting the legal title in the husband, moved unquestionably from the wife.
From every view I have been able to take of this case, my mind has been brought to a clear conviction that the appellants, the heirs of Mrs. Jennings, are entitled to at least five-sevenths of the lands in controversy. The only doubt I have is, whether they are not entitled to the whole. My brethren think otherwise, which is the only circumstance that could cause a doubt as to the correctness of my conclusion. But it has not changed my conviction as to the right of the case. I must therefore ’’’adhere to . my opinion, though with diffidence and regret that I have to dissent.
MONCURE, P„ and STAPLES, J., concurred in the opinion of CHRISTIAN, J.
Decree affirmed.